BOZAR v. CENTRAL PENNSYLVANIA QUARRY, STRIPPING & CONSTRUCTION CO.

Civ. No. 2721.

District Court, M. D. Pennsylvania.

Oct. 2, 1947.

804

Arthur A. Maguire, U.S.Atty., and Joseph P. Brennan, Asst. U. S. Atty., both of Scranton, Pa., for petitioner.

John H. Bigelow and Joseph R. Sherman, both of Hazleton, Pa., for respondent.

MURPHY, District Judge.

Petitioner is an employee of the Central Pennsylvania Quarry, Stripping and Construction Company, a Pennsylvania corporation having its principal place of business [1] in the City of Hazleton in this district. He entered its employ February 8, 1944, as a truck driver and worked for it at Hauto, Pennsylvania, on an ash bank removal job until he was inducted into the Army March 23, 1944. He served in the Army until January 17, 1946, when he was honorably discharged and received a certificate to that effect.

After his tour of duty in the Army ended, he was qualified to perform the duties of a truck driver. Within eight days of his discharge he applied to the corporation, as was his right under the Selective Training and Service Act of 1940, 54 Stat. 885, 50 U.S.C.A.Appendix, § 301 et seq., for restoration to his former position. He was offered a position as truck driver on a job between 'Centralia and Ashland, Pennsylvania, on January 28, 1946, a position respondent contended was of like seniority, status and with higher pay than petitioner formerly received. Petitioner refused to accept the offer of employment and insisted on being engaged to work on another contract respondent was then performing in the same city where petitioner had formerly worked for respondent, to wit, Hauto, Pennsylvania.

Petitioner enlisted the aid and service of the Veterans' Assistance Program officials in the Pennsylvania Selective Service headquarters, after going through local channels. After investigation, the chief of the legal division wrote on behalf of the State Director of Selective Service for Pennsylvania advising respondent that they were "writing the veteran and recommending that he accept" the position offered to petitioner by respondent. Petitioner refused to follow the recommendation and enlisted the aid of the United States Attorney for this district, for aid in the preparation of a petition and the prosecution thereof before the court. Whereupon a petition was filed under Section 8 (e) of the Selec-

---

[1] Respondent's principal office is located in Hazleton, Pennsylvania, within this district.

tive Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 308(e) for restoration of employment as provided by Section 8 (b) (B) of the Act, 50 U.S.C.A.Appendix, § 308(b) (B) and for loss of wages as provided in Section 8(e).

The questions for decision are: Is petitioner qualified for the job he seeks? Was his position with respondent other than temporary? Was there such a change in the employer's circumstances as to make it impossible or unreasonable to restore petitioner to his former position? Did respondent in good faith comply with the requirements of the Act and offer petitioner a position of like seniority, status and pay? Was the demand of the petitioner reasonable and within the protection afforded him by the Act?

Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following Section 723c, provides inter alia, "in all actions tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment * * *."

In this case there is substantial agreement on the facts. The crux of the situation lies in the solution of the question whether respondent complied with the Act by offering petitioner the job on the highway between Centralia and Ashland, or does the scope of the protection afforded the veteran by the Act require that he be given the job demanded at Hauto, Pennsylvania?

The situation can be more easily understood and resolved by a statement of the pertinent facts.

Respondent corporation, as its name implies, is engaged from time to time and place to place wherever it is the successful bidder in competition with other construction companies in quarry work, coal stripping, and construction of various kinds, e. g. airport and highway construction. On occasion it receives contracts for removal of ash banks and on occasion contracts are given respondent by some of the Anthracite coal companies for removal and hauling of coal banks to railroad cars for transportation to coal breakers, or sometimes removal

of the coal banks and hauling directly to the coal breakers, as well as hauling the reject material from the banks and from the coal breakers.

When respondent receives a contract for work with other than the Anthracite coal companies, it is free to operate and does operate on a non-union basis, to hire and fire whomsoever it pleases, with the right to fix rates of pay; hours of work as it desires providing it can satisfy the men it employs, and the conditions of the contracts under which it is engaged as to time allotted for completion of the contract. On these contracts there was no union among respondent's employees, no seniority rights or seniority roster. Status was fixed by the working arrangements between the individual employer and employee.

The situation is considerably different when respondent receives a contract to do work for one of the Anthracite coal companies. That situation is uniformly controlled by an agreement executed May 26, 1939, between the mine union and the coal operators, reaffirmed and continued by supplementary agreements. May 20, 1941, March 8, 1944, May 19, 1945, June 7, 1946. One of the conditions of any contract entered into by a contractor with an Anthracite coal company is compliance with the terms of the agreement of 1939. A refusal to accept the conditions of Paragraph 3 of that agreement would mean inability to receive the contract; non-compliance with its terms would mean a strike by the mine union to enforce the terms of its contract.

Paragraph 3 of the 1939 agreement provides inter alia, "It is agreed that the United Mine Workers of America is recognized ...... as the exclusive bargaining agency representing the employees ...... it is agreed that as a condition of employment all employees shall be members of the United Mine Workers of America ......" (with an exception not here pertinent).

The mine union contract with the operators calls for a seven hour day and a five day week, with special provisions for work when performed on the sixth day in any work week. Wages are fixed at rates which must be conformed to by the entire industry.

When petitioner was employed by the respondent he was engaged to work as a truck driver hauling ashes from an ash bank. The contract of respondent was with the Pennsylvania Power and Light Company, executed December 29, 1943; work commenced January 1, 1944, and time being of the essence was to be completed May 31, 1944. The work was finished and the contract terminated August 10, 1944. A new contract was awarded respondent April 18, 1944, work to commence June 1, 1944, to be completed August 31, 1944, and finally one on August 10, 1945, to be completed December 31, 1945. This was a non-union contract with working conditions as described supra. Petitioner left this job to be inducted into the Army March 23, 1944.

While petitioner was in the Army, i. e., May 18, 1944, respondent was awarded a contract for the removal and hauling of coal and reject material by the Hauto Coal Company, an Anthracite coal company at Hauto, Pennsylvania. This contract was subject to the closed shop condition, and other arrangements described supra. Because of war conditions and the scarcity of labor, the union could not supply sufficient men to meet respondent's needs. An arrangement was made whereby respondent could engage non-union men on condition they became members of the miners' union within 30 days from hiring. Respondent's work under the Pennsylvania Power and Light Company contract was then about completed so that respondent offered and many of the truck drivers on the Pennsylvania Power and Light job accepted positions as truck drivers and became members of the mine union within 30 days of hiring. This work was continuing at the time of petitioner's application to be restored to his employment. Some of those employed on the Hauto Coal Company job were employed at a date later than petitioner was employed on the Pennsylvania Power and Light Company job and on the Hauto Coal Company job, but all of necessity became members of the mine union.

By January 1946, the labor supply was more plentiful. The mine union insisted on their closed shop agreement and consequently only mine union members could be engaged by respondent. In order to employ petitioner respondent was confronted with several alternatives. Respondent could take the position that petitioner was qualified as a truck driver but not qualified as a member of the mine union; that the position under the Pennsylvania Power and Light Company contract was temporary. Respondent contends that truck drivers are engaged for each separate contract and when the work is completed they are then offered work on some other contract of respondent which they may accept or reject, and that the contract on which petitioner was working terminated August 10, 1944. Respondent contends that it reserved and had the right in all cases to transfer a truck driver from job to job, which he must accept or lose employment. This would apply to all contracts other than those where the mine union conditions prevail. Finally respondent could contend that because of the closed shop provision, the termination of the contract, the ineligibility of the petitioner since he was a non-union man, respondent was not obliged to engage him on the Hauto Coal Company job. That he had a right when petitioner was in his employ to transfer him at will, and that at all events conditions had so changed that it was impossible or unreasonable to expect him to engage petitioner on the Hauto Coal Company job, and therefore the only proper solution within respondent's control in order to carry out the spirit and intent of the Act was to offer him the highway construction job, which respondent did.

When petitioner refused to accept, respondent then had two alternatives; (a) He could discharge an employee of the union and engage petitioner in his place. This would in all probability result in a strike and the discharge of petitioner, or a loss of the contract by respondent, with a consequent financial loss to petitioner and respondent, and a failure to provide for the rehabilitation of petitioner, the purpose of Congress in passing the Act; (b) Respondent could attempt to arrange with the union to have petitioner accepted as a member and then hire him on the coal company job. Respondent's president suggested to petitioner that respondent would arrange such a meeting with the union president to see if union membership could

be accomplished. Petitioner refused to participate in such meeting, saying that the effort would be futile, and insisted that he would not accept respondent's offer of a job on the highway but that, on the contrary, respondent should discharge one of the men, who were not veterans and who were hired after he was employed on February 8, 1944, and give him his place on the payroll.

Since petitioner refused to accept the offer of employment and was ineligible under the circumstances for the coal company job, respondent did no more but continue his offer of employment and prepare to defend the action.

Petitioner's position is that he has a wife and young child at Hazleton; that the Hauto job is only 17 miles from his home; that transportation is available in the car of friends to get to Hauto, whereas he would have to live at Centralia or Ashland, 26 miles away, no transportation being available.

Respondent suggested that petitioner claim a job on an operation of respondent two miles from his home. Petitioner refused, insisting that under the Act respondent is obliged to engage him at Hauto and to respond in damages for his failure to do so.

This is an action by an employee of a private employer to enforce compliance with the reemployment provisions of the Selective Training and Service Act of 1940, as amended, over which this court has jurisdiction. 50 U.S.C.A.Appendix, § 308(c), Sullivan v. Milner Hotel Co., D.C., 66 F. Supp. 607; Droste v. Nash-Kelvinator Corp., 64 F.Supp. 716.

The solution of the problem presented requires a construction of subsection (b) (B), (c) of Section 8 of the Act. 50 U.S.C.A.Appendix, Section 308(b) (B), (c), which read as follows:

"(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within ninety days after he is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year * * * (B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so;

"(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration."

The policy of the Act is declared in Section 1(b), 50 U.S.C.A.Appendix, § 301(b) to be that "the obligations and privileges of military training and service should be shared generally in accordance with a fair and just system * * *." See Grasso v. Crowhurst, 3 Cir., 154 F.2d 208, 210, 211. The Act is to be liberally construed for the benefit of those who left private life to serve their country in its hour of need. The separate provisions of the Act are to be construed as part of an organic whole giving each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits. Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, at page 285, 66 S.Ct. 1105, 90 L.Ed. 1230, 167 A.L.R. 110.

The words are to be given their natural, ordinary and familiar meaning unless Congress has definitely indicated the words should be construed otherwise. The plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow or strained construction.

Western & Southern Life Ins. Co. v. Huwe, 6 Cir., 116 F.2d 1008. The factors which usually determine the nature of a disputed relationship must be considered in the light of the purpose which Congress intended to accomplish. Kay v. General Cable Corp., 3 Cir., 144 F.2d 653, 654.

■ Such liberal construction should not be carried to the point where it does violence to the Act itself. Parliman v. Delaware, Lackawanna & Western R. R., 3 Cir., 163 F.2d 726.

■ Military service should entail no greater set back in the private pursuit or career of the returning soldier than is unavoidable. Kay v. General Cable Corp., supra. The veteran could not be "disadvantaged by his service to the nation." Trailmobile Co. v. Whirls, 331 U.S. 40, 67 S.Ct. 982, 991. He is "not to be penalized on his return by reason of his absence from his civilian job"; in fact, he was to gain an advantage which the law withheld from those who stayed behind. These guarantees are contained in Section 8 of the Act: (1) Time to plan for the future, readjust to civilian life and reapply for his position. Section 8(b). (2) He must be restored to his former position or "to a position of like seniority, status, and pay". Section 8(b) (B). He is thus protected from receiving a job inferior to that which he had before entering the armed services. (3) He shall be "restored without loss of seniority" and be considered "as having been on furlough or leave of absence" during the period of his service for his country, with all of the insurance and other benefits accruing to employees on furlough or leave of absence. Section 8(c). Thus he does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war. (4) He "shall not be discharged from such position without cause within one year after such restoration". Fishgold v. Sullivan Drydock & Repair Corp., supra, at pages 284, 285 of 328 U.S., at page 1111 of 66 S.Ct., 90 L.Ed. 1230, 167 A.L.R. 110.

" * * * No practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act." At page 285 of 328 U.S., at page 1111 of 66 S.Ct., 90 L.Ed. 1230, 167 A.L.R. 110.

An examination of the terms of the Act and the language of the Supreme Court indicates that the Act gave the veteran four "guarantees": (1) The 90 day provision; (2) To be restored to his old job or one of like status and pay; (3) He retains his seniority as if he had never left the job; (4) He shall not be discharged for a year without cause.

To obtain these guarantees several conditions must be met: (1) The position left must be other than temporary; (2) A proper certificate of discharge; (3) He must be still qualified to perform the duties; (4) Make timely application.

■ He has no superseniority in case of layoffs over non-veterans of greater seniority. Fishgold v. Sullivan Drydock & Repair Corp., supra. Trailmobile Co. v. Whirls, supra. " * * * § 8(c), although giving the reemployed veteran a special statutory standing in relation to 'other rights,' as defined in the Fishgold case, during the statutory year, and creating to that extent a preference for him over non-veterans, did not extend that preference for a longer time."

The provisions of Section 8(b) and Section 8(c) "guarantee the veteran against loss of position or loss of seniority by reason of his absence". 328 U.S. 275, at page 285, 66 S.Ct. at page 1111, 90 L.Ed. 1230, 167 A.L.R. 110. "He acquires not only the same seniority he had; his service in the armed services is counted as service in the plant so that he does not lose ground by reason of his absence. But we would distort the language of these provisions if we read it as granting the veteran an increase in seniority over what he would have had if he had never entered the armed services. We agree with the Circuit Court of Appeals that by these provisions Congress made the restoration as nearly a complete substitute for the original job as was possible. No step-up or gain in priority can be fairly implied. Congress protected the veteran against loss of ground or demotion on his return. The provisions for restoration

without loss of seniority to his old position or to a position of like seniority mean no more." 328 U.S. 275, at pages 285, 286, 66 S.Ct. at page 1111, 90 L.Ed. 1230, 167 A.L. R. 110.

"The 'position' to which the veteran is restored is the 'position' which he left plus cumulated seniority." At page 287 of 328 U.S., at page 1112 of 66 S.Ct., 90 L.Ed. 1230, 167 A.L.R. 110.

"Moreover a veteran on his return is entitled to his old 'position' or its equivalent even though at the time of his application the plant is closed down, say for retooling, and no work is available, unless of course the private employer's 'circumstances have so changed as to make it impossible or unreasonable' to restore him. § 8(b) (B). He is entitled to be recalled to work in accordance with his seniority. His 'position' exists though no work is then available. * * * Congress recognized in the Act the existence of seniority systems and seniority rights. It sought to preserve the veteran's rights under those systems and to protect him against loss under them by reason of his absence. There is indeed no suggestion that Congress sought to sweep aside the seniority system. What it undertook to do was to give the veteran protection within the framework of the seniority system plus a guarantee against demotion or termination of the employment relationship without cause for a year." At page 288 of 328 U.S., at page 1112 of 66 S.Ct., 90 L.Ed. 1230, 167 A.L.R. 110.

■ The petitioner had no seniority at the time of his induction. Seniority arises only out of contract or statute. Trailmobile Co. v. Whirls, 331 U.S. 40, 67 S.Ct. 982, 988, footnote 21. It has been held that an employee "has no inherent right to seniority in service, * * * except as provided for in the contracts entered into and the rules adopted by the company relating thereto." Polanskey et al. v. Monongahela R. Co., 342 Pa. 188, 19 A.2d 377, 379, citing Ryan v. New York Central R. Co., 1934, 267 Mich. 202, 255 N.W. 365, 367. See also Casey v. Brotherhood etc., 197 Minn. 189, 191, 192, 266 N.W. 737, "Aside from contract there is no inherent or fundamental right to preference by virtue of

seniority in service." See 46 Col.L.Rev. 1030 et seq.

See concurring opinion Biggs, J., Di Maggio v. Elastic Stop Nut Corp., 3 Cir., 1947, 162 F.2d 546, at page 548, " 'Seniority' is a rule fixing an employment service period and 'status' is no more than the condition of an individual's right to employment. It appears from the decision of the Supreme Court in the Trailmobile Co. case [331 U.S. 40], 67 S.Ct. 982, that the bundle of rights represented by 'seniority, status, and pay' are not severable."

"Section 8(b) (B) refers to the job to which the veteran is entitled to be restored, i. e., simply the same job which he left, or its equivalent. Section 8(c) specifies what rights he shall have in that job." See dissenting opinion, Trailmobile v. Whirls, supra[67 S.Ct. 995].

■ It is obvious from the foregoing that the employment of the petitioner was not "temporary" but the kind of employment to which the veteran should be restored after his discharge.

■ The job petitioner left was as a truck driver on a non-union contract which was to terminate May 31, 1944. When petitioner left it was not certain where the work of the next contract would be located. Petitioner was subject to transfer to the new job wherever it was, or free to quit and seek other employment. If before petitioner's induction respondent obtained a union contract petitioner would not be qualfied to obtain a job thereon unless he was a member of the union. There was nothing in this arrangement which in any way was meant to discriminate against the veteran as such. See Gauweiler v. Elastic Stop Nut Corp., 3 Cir., 162 F.2d 448, and footnote at page 452.

There is nothing in the Act which precludes respondent from entering into the coal company contract or from entering into the closed shop agreement with the union. Long before petitioner was engaged by respondent it had been the practice of respondent to accept contracts from coal companies and to agree to the conditions of the 1939 agreement. There was certainly no intention on the part of Congress to stop such a course of business. To quote

Mr. Justice Rutledge under circumstances other than those here present. "We do not think Congress had in mind such far-reaching consequences for the nation-wide system of employment, both public and private, when making the statutory provisions for the veteran's benefit." Trailmobile Co. v. Whirls, supra.

The respondent could not offer petitioner a job on the contract which no longer existed. He did however offer its equivalent.

Petitioner was admittedly a competent truck driver and qualified for the position offered but he was not qualified for the position demanded in view of the requirement that "all employees be members of the United Mine Workers of America."

Webster's New International Dictionary, Second Edition, defines "qualified" as inter alia, "Having complied with the specific requirements of precedent conditions for an office, appointment, employment, etc." See Trusteed Funds, Inc. v. Dacey, 1 Cir., 1947, 160 F.2d 413, at page 420, holding that "qualified" means more than "simply physically and mentally qualified".

The obtaining of the coal company contract in the same city as petitioner had worked was merely a coincidence. It did not create any special right in petitioner. See Salter v. Becker Roofing Co., D.C., 65 F.Supp. 633, 635. In that case the position the veteran left was still open notwithstanding an inconsistent contract with a new employee who held the precise job the veteran had occupied; also the salary of the job offered was less than in the old position. While the court discusses the housing shortage, the expense of maintaining two homes,. and the difficult social conditions, there was enough without them to support the decision. Cf. Trusteed Funds, Inc. v. Dacey, supra. There too the position out of town was at less pay and there was a claim that the old job existed at least in part.

Said the court in the Salter case, "However, this court * * * would not, have it appear that it is incumbent upon all employers to reemploy * * * under this Act at the same place of employment as * * * they had before entrance into the armed service. The statute makes no such requirement * * * the rule is not general, but special, as the court feels that the facts of this particular case merits such a requirement on the part of the employer."

In Meehan v. National Supply Co., 10 Cir., 160 F.2d 346, 347, the veteran was offered his old job but demanded a new position created while he was in the Army and in another city.

The language of the court is particularly appropriate in the solution of our problem. "The Act is to be construed liberally in order to effectuate the Congressional purpose * * * and preserve to them the full benefits of the position which they occupied at the time for the period of time fixed in the act. But this does not justify a strained construction of facts in order to give a returning veteran a higher position than the one he occupied at the time he entered the service, or a new position created after he was in the service."

See Boston & Maine R. R. v. Bentubo, 1 Cir., 1947, 160 F.2d 326, 328, "Congress did not make the right to reemployment absolute. It gave that right only when the employer's circumstances had not so changed as to make it not only not impossible but also not 'unreasonable' for the employer to reemploy the veteran. It must therefore have envisaged the probability that in the future an infinite variety of factual situations would arise, and recognizing the futility of any attempt to prescribe a remedy for every situation, it contented itself with a statement of a public policy and left the application of its policy to particular situations to the sound discretion of the district courts."

In Hewitt v. System Federation etc., 7 Cir., 1947, 161 F.2d 545, the court held that where there was a collective bargaining agreement between the railroad and car cleaners and carman helpers respectively, it was error for the district court to order one group to be transferred to the seniority roster of the other.

In Kay v. General Cable Corp., supra, it was held that "unreasonable" means more than inconvenient or undesirable. The difference between 17 and 26 miles was created only because the place of the new contract was in a different city. Other em-

ployees of respondent would have to move or be transported to the new location.

Factors other than length of service, such as skill, sex, type of work, union membership and union office may determine employment rights. 46 Col.L.Rev. at 1031, footnote 8. See also Gauweiler v. Elastic Stop Nut Corp., supra; Di Maggio v. Elastic Stop Nut Corp., supra; Koury v. Elastic Stop Nut Corp., 3 Cir., 1947, 162 F.2d 544; Payne v. Wright Aeronautical Corp., 3 Cir., 162 F.2d 549.

■ Seniority rights under collective bargaining agreements may not be impeached by individual contracts. See J. I. Case Co. v. N. L. R. B., 1944, 321 U.S. 332, 338, 339, 64 S.Ct. 576, 88 L.Ed. 762. Employers cannot refuse to bargain with the union. N. L. R. B. v. George P. Pilling & Sons Co., 3 Cir., 1941, 119 F.2d 32. Nor can they reject a justifiable demand to modify an existing agreement. Consolidated Aircraft Corp. v. N. L. R. B., 9 Cir., 1944, 141 F.2d 785.

Thus the respondent was torn between the desire to accommodate the situation to the petitioner's demand and the rule precluding separate agreements on matters subject to collective bargaining agreements. Cf. Order of Railroad Telegraphers v. Railway Express Agency Inc., 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788. Here the respondent without being legally bound to do so offered his efforts to enable petitioner to join the union and to have the union accept him. The petitioner refused to participate in the discussion.

See Feore v. North Shore Bus Co., 2 Cir., 1947, 161 F.2d 552, 554. "Among the conditions of plaintiff's prewar job were the union contract and the seniority and quarterly pick systems. He had no cause for complaint under the statute when these same conditions were present in the postwar job offered him. Grubbs v. Ingalls Iron Works Co., D.C.,N.D.Ala., 66 F.Supp. 550."[2] And again "Plaintiff did not allege or prove that he availed himself of this method." Id. This refers to the particular method as prescribed in the union contract.

In the Feore case the court said, "It is not without significance that about 120 veterans who returned to defendant's employ before plaintiff all accepted similar offers", nor do we think it without significance in this case that the respondent had 120 of his employees, at one time or another veterans of World War II, and this case presented the only difficulty which arose in the readjustment problem of veterans.

■ Under the circumstances, we hold that the demand of the petitioner was unreasonable and not within the rights guaranteed to him by the Act. He should have accepted the position offered to him by respondent.

■ Finally, but one other matter need be considered. The mere fact that the veteran demanded more than he was entitled to does not preclude the court from granting him the relief to which he is entitled. See Trusteed Funds, Inc. v. Dacey, supra.

Since our position is that the petitioner is not entitled to the job demanded, it is unnecessary to discuss interim damages. Trusteed Funds, Inc. v. Dacey, supra, 160 F.2d 413, at page 422.

■ In our judgment the position held by the veteran before induction was "other than a temporary position". It is obvious from the words of the Act that Congress considered the possibility that the particular position at which the veteran was working may no longer exist when application for reemployment is made. In that event the employer must restore him to the equivalent of the former position. See United States v. Wimbishs, 4 Cir., 1946, 154 F.2d 773 (a seasonal worker with no contract); United States v. North American Creameries, D.C., 70 F.Supp. 36 (a seasonal worker—despite a union contract executed while in service the veteran was restored to his former position); Sullivan v. West Co., D.C., 67 F. Supp. 177 (the particular work was transferred to another company but the employer was engaged in the same general business); David v. Boston & M. R. R., D.C., 71 F.

---

[2] See also, Featherston v. Jersey Central Power & Light Co., 3 Cir., 161 F.2d 1000, 1003.

Supp. 342, (The word "position" in the Act means employment in the particular job before performed. Citing Morgan v. Wheland, D.C., 66 F.Supp. 439, 440); Sullivan v. Milner Hotel Co., supra (despite transfer of activities from one affiliated corporation to another, position of receptionist must be restored).

The title given a position is not conclusive. Trusteed Funds, Inc. v. Dacey, supra. The term "restored to such position" means a reinstatement of such person to the same relative place, rank or standing in the employment of his employer. Droste v. Nash-Kelvinator Corp., supra.

A large part of our industrial employment is terminable at will at any time by either party. This would not however mean that the job of every worker was "temporary". See N. L. R. B. v. Waterman S. S. Corp., 309 U.S. 206, at page 219, 60 S.Ct. 493, 84 L.Ed. 704, (ship employees under the National Labor Relations Act, 29 U.S.C.A. § 51 et seq.

The respondent has stated in open court that the position of truck driver with the same seniority, status, and pay is open to the petitioner. The petitioner should accept such position.

An order in compliance with the foregoing will be filed this date.